**SIERRA CLUB, Plaintiff,**

v.

**William D. RUCKELSHAUS, in his official capacity as Administrator of the United States Environmental Protection Agency; and the United States Environmental Protection Agency, Defendants.**

**Idaho Mining Association, Defendant-Intervenor.**

**No. C–84–0656 WHO.**

United States District Court, N.D. California.

July 24, 1984.

On Order of Contempt Dec. 11, 1984.

Roger Beers, Beers & Dickson, San Francisco, Cal., for plaintiff.

Joseph P. Russoniello, U.S. Atty., Francis B. Boone, Asst. U.S. Atty., San Francisco, Cal., Dean K. Dunsmore, U.S. Dept. of Justice, Washington, D.C., for defendants.

Albert J. Beveridge, III, Carl Eardley, Gary H. Baise, Don G. Scroggin, Beveridge & Diamond, P.C., Washington, D.C., E. Lewis Reid, Michael R. Marron, Marron, Reid & Sheehy, San Francisco, Cal., for defendant-intervenor Idaho Mining Ass'n.

## OPINION

ORRICK, District Judge.

The Sierra Club, an organization devoted to the preservation of the environment, filed this suit against William D. Ruckelshaus as Administrator of the United States Environmental Protection Agency (the "EPA") to compel the EPA to comply with certain requirements of the federal Clean Air Act, 42 U.S.C. §§ 7401 *et seq.* Because the sole question in the case is a matter of statutory interpretation and enforcement, plaintiff filed a motion for summary judgment, which is now before the Court. Also before the Court is a motion for intervention filed by the Idaho Mining Association pursuant to Federal Rule of Civil Procedure 24(a). For the reasons detailed below, the motion to intervene and plaintiff's motion for summary judgment are both granted.

I

The dispute now before this Court had its genesis in 1977 when Congress determined that radionuclides posed a potentially serious health hazard.[1] Radionuclides are radioactive particles that may be released into the atmosphere from a wide range of sources, including facilities that use radioactive materials (nuclear power plants, weapons factories, hospitals), and uranium and phosphate mining operations. Finding that no federal agency regulated these emissions, Congress amended the Clean Air Act, instructing the EPA to investigate radionuclides and to determine if these emissions indeed posed a health risk. 42 U.S.C. § 7422.[2] The Act then required

---

1. The House Report accompanying the bill that ultimately became the Clean Air Act amendments of 1977 specifically addressed Congress' concern with radionuclide emissions:

    "It is clear that exposure to radioactive materials can cause serious harm to health, including cancer, genetic damage, and birth deformities. Materials that are radioactive may remain so for thousands of years. This longevity poses a special problem for living organisms. Furthermore, exposures to radioactivity are cumulative, that is, each new or additional exposure increases the risk of serious illness."

    H.R.Rep. No. 95–294, 95th Cong., 1st Sess. 36–37, *reprinted in* (1977) U.S.Code Cong. & Ad. News 1077, 1114–15.

2. 42 U.S.C. § 7422(a) provides in pertinent part:
    "Not later than one year after August 7, 1977 (two years for radioactive pollutants) and af-

the EPA, if it determined that radionuclides posed a health risk, to issue emission standards on a timetable fixed by statute. *See* 42 U.S.C. §§ 7412, 7422.

After investigation, the EPA in November 1979 issued its determination that radionuclides increase the risk of cancer, genetic damage, and death, and added radionuclides to the list of "hazardous pollutants" regulated pursuant to the Clean Air Act, 42 U.S.C. § 7412.

Having made that determination, the EPA was required by statute to issue *proposed* regulations, which were to be followed by final regulations:

"Within 180 days after the inclusion of any air pollutant in such list, the Administrator shall publish proposed regulations establishing emission standards for such pollutant together with a notice of a public hearing within thirty days. Not later than 180 days after such publication [of the proposed standards], the Administrator shall prescribe an emission standard for such pollutant, unless he finds, on the basis of information presented at such hearings, that such pollutant clearly is not a hazardous pollutant. * * *"

42 U.S.C. § 7412(b)(1)(B).

The EPA did not issue the *proposed* regulations within the 180 days prescribed by statute and in 1982 the Sierra Club sued the EPA in *Sierra Club v. Gorsuch,* 551 F.Supp. 785, 786 (N.D.Cal.1982) (Sweigert, J.). On plaintiff's motion for summary judgment in that case, the court ruled that the EPA had failed "to perform its mandatory statutory duty to issue proposed radionuclide emission standards within 180 days of listing them as a hazardous air pollutant." *Id.* at 787.

By way of designing an appropriate remedy, Judge Sweigert at first offered to allow the EPA to develop a compliance schedule and to attempt to agree with plaintiff as to that schedule. The EPA, in response, offered to issue proposed regulations by *1989,* more than nine years after the mandatory statutory deadline. Judge Sweigert, finding that Congress had set the 180-day limit for the precise purpose of rapidly implementing clean air standards, rejected the EPA's proposal and ordered it to issue proposed regulations for radionuclides within 180 days. *See id.* at 789. The EPA finally issued proposed standards for radionuclide emissions on April 6, 1983, approximately three years after the deadline set by statute.

The next stage in the Clean Air Act's regulatory process is the issuance of final regulations governing emissions of the hazardous air pollutant. Section 7412(b)(1)(B), quoted above, mandates that the EPA will either issue the *final* emission standards, or make a determination that radionuclides do not pose a health risk, within 180 days after issuance of the proposed regulations. The final regulations for radionuclide emissions were, therefore, due on October 3, 1983; to date the EPA has not issued final regulations.

The Sierra Club has again sued in the case now before this Court for a judgment ordering the EPA to comply with the mandatory requirement of 42 U.S.C. § 7412.

## II

The proposed intervenor in this lawsuit, Idaho Mining Association ("the Association"), represents numerous companies that mine more than 50 percent of the elemental phosphorus produced in the United States. Radionuclides are emitted when elemental phosphorus is mined and processed.

Intervention in a lawsuit is permitted of right upon the timely application of anyone with an interest in the subject matter of the litigation, who is so situated that disposition of the case may "as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest

ter notice and opportunity for public hearing, the Administrator [of the EPA] shall review all available relevant information and determine whether or not emissions of radioactive

pollutants * * * into the ambient air will cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health."

is adequately represented by existing parties." F.R.Civ.P. 24(a).[3]

Because Association members mine phosphorus, they will be directly affected by final radionuclide emission standards.[4] Although the Association is arguably more concerned with the content of the regulations, a matter not before this Court, than with when they are issued, and would have the opportunity to litigate the merits of the regulations at a later date,[5] such an after-the-fact remedy

"may, 'as a practical matter,' afford much less protection than the opportunity to participate in * * * proceedings that seek to ensure sustainable regulations in the first place, with no need for judicial review. * * * [I]t may [also] be that review might be had only after final effectiveness, during a period when appellants may be subject to compliance and enforcement [of the regulations]."

*Natural Resources Defense Council v. Costle,* 561 F.2d 904, 909 (D.C.Cir.1977). Thus, the Association's interests might be impaired if intervention in this action were not allowed.

■ Finally, although both the Association and the EPA oppose the motion for summary judgment, the ultimate interests of the mining Association clearly differ from those of the EPA.[6] *See id.* at 912 (agency's interest in content of regulation will differ from the interest of the one governed by those regulations). Accordingly, the motion for intervention by the Association is granted.

## III

In its brief opposing summary judgment, the EPA admits that "it has not made the required determinations within the time established by 42 U.S.C. § 7412(b) and that it is under a statutory obligation to make these determinations." Def.Br. at 2:10–13. Nonetheless, the EPA and the Association oppose summary judgment. The EPA argues, first, that the Sierra Club has no standing and, second, that this Court should exercise its discretionary power to refuse the remedy sought. The Association argues that issuance of these regulations is not, in fact, a matter of great urgency and that certain procedural steps must be completed by the EPA before final standards are promulgated.

## A

■ In enacting the Clean Air Act, Congress specifically provided for citizen suits to enforce the Act. Section 7604(a) provides in pertinent part that:

"any person may commence a civil action on his own behalf—

* * * * * *

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary * * *."

An association has standing to sue if it or its members are in a position to suffer actual or threatened injury. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

■ Although the government raised no objection to the Sierra Club's standing to sue in the prior suit before Judge Sweigert, it here argues that plaintiff has failed to prove "its membership and alleged injury

3. The parties have not opposed the motion of Idaho Mining Association to intervene.

4. Regulated industries are required to comply with final emission regulations within ninety days of their issuance by the EPA. 42 U.S.C. § 7412(c)(1)(B).

5. The merits of regulations promulgated under the Clean Air Act may be litigated before the Court of Appeals for the District of Columbia

Circuit. 42 U.S.C. § 7607(b)(1); *see* Section IIIB *infra.*

6. The "adequacy of representation" prong of the intervention test carries only a minimal burden of showing that the intervenor's interests in the litigation "may be" inadequately represented. *See Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 636 n. 10, 30 L.Ed.2d 686 (1972).

or threatened injury thereto." *See* Def. Br. at 6.

In response to the standing argument the Sierra Club has offered the declaration of Eugene Coan, Assistant Conservation Director of the Sierra Club, demonstrating that members of the Sierra Club live in close proximity to specific facilities that emit radionuclides.[7] *See* Plf. Reply Br. at 4 and Declaration of Coan. That declaration more than adequately illustrates the threat of injury to Sierra Club members and establishes plaintiffs' standing to sue.

### B

■ The Association's first argument against summary judgment is that "the fixing of an early date for issuing final regulations is not urgent." Assoc.Br. at 7. Taking as an example the EPA's hypothetical that radionuclide emissions from a particular phosphorus plant pose only one potential cancer death in 100 years of plant operation, the Association urges that there is no emergency and that this Court should not order the EPA to issue final regulations pending further EPA review of the health risks caused by radionuclides.

Whatever the scientific merits of the Association's position may be, the "emergency" factor is irrelevant to this lawsuit. This Court has no jurisdiction to evaluate the health risks posed by radionuclides or to review the adequacy or even the need for regulation. Congress divided jurisdiction to review actions pursuant to the Clean Air Act between the district and appellate courts. The district court may enforce nondiscretionary agency actions, 42 U.S.C. § 7604(a); only the Court of Appeals for the District of Columbia may review the merits of regulations, the risks associated with the pollutant, or the adequacy of

the data before the EPA when it promulgates regulations pursuant to the Act, 42 U.S.C. § 7607(b)(1). The need for regulation of radionuclide emissions is simply not a matter that this Court has the power to determine.

### C

■ The Association also argues, joined by the EPA, that the Act sets forth several "nondiscretionary" procedural requirements that the EPA must follow before issuing a final rule. Particularly, it is contended that the Administrator must make a determination that the pollutant poses a "significant health risk" by preparing a "health assessment document"; that the health assessment document must be reviewed by certain advisory agencies; and that Congressionally established advisory committees must be consulted.

In making this argument, the Association and the EPA rely on certain sections of the Clean Air Act that, when read in context, do not at all support their position. First, they point to the rule-making provision of the Act, 42 U.S.C. § 7607. Subsection (d)(6)(A) provides that a promulgated rule "shall be accompanied by" certain supporting documents, which the EPA and the Association claim have not yet been prepared. Subsection (d)(10) of § 7607, however, provides that when the statutory deadline for promulgating a rule is *less* than six months after the date of proposal, the Administrator can extend the deadline for issuance of the final rule by another six months.[8] Where, as here, the statutory deadline for promulgating the final rule is six months or more after the proposals, no such extension is provided, whether or not the supporting materials have been prepared.

---

7. Paragraph 6 of Mr. Coan's declaration, for example, states that approximately 1,092 members of the Sierra Club live near Department of Energy facilities that emit radionuclides in Columbus, Ohio.

8. 42 U.S.C. § 7607(d)(10) provides:
   "Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection."

The second section relied on by the Association and the EPA, 42 U.S.C. § 7417(c), also does not support their position. That section provides that before issuing emission standards, the EPA administrator "shall, to the maximum extent practicable *within the time provided,* consult with appropriate advisory committees, independent experts, and Federal departments and agencies." *Id.* Thus, while the statute requires consultation to "the maximum extent *possible,*" it specifically provides that such activities must be carried out within the statutory deadlines for issuing the regulations.

### D

■ The primary argument made by the EPA and joined by the Association is that even though the EPA has violated the Act, this Court has the discretion to fashion any appropriate remedy and is not required to order immediate compliance.[9]

The remedy requested by plaintiff, a mandatory injunction ordering the EPA Administrator to act, is within the jurisdiction of this Court as established by the Act: "The district courts shall have jurisdiction * * * to order the Administrator to perform such [a nondiscretionary] * * * act or duty * * *." 42 U.S.C. § 7604(a).

The EPA contends that the Court's jurisdiction to order compliance with a statutory duty does not automatically divest the Court of its usual discretion in fashioning appropriate remedies. This argument, while correct, ultimately fails, because the EPA has not carried its burden of proving that compliance with the statutory deadline is impossible.

The principle that the district court has discretion to fashion remedies other than injunctive relief when the EPA administrator fails to perform a nondiscretionary act

is well-supported. In *Weinberger v. Carlos Romero-Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), for example, the Supreme Court held that "[t]he grant of jurisdiction to insure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of the law." *Id.,* 102 S.Ct. at 1803.

■ The Court of Appeals for the District of Columbia Circuit has given some instruction on when a court should withhold injunctive relief to compel performance of a statutory duty. In *Natural Resources Defense Council v. Train,* 510 F.2d 692 (D.C.Cir.1975), the court affirmed the lower court's imposition of a timetable for EPA compliance with the regulations, but noted:

"We perceive two types of constraints which might delay the formulation of adequate guidelines * * * beyond the deadline established by the Act. First, it is possible that budgetary commitments and manpower demands required to complete the guidelines * * * are beyond the agency's capacity or would unduly jeopardize the implementation of other essential programs. Second, the EPA may be unable to conduct sufficient evaluation [of factors relevant to issuing appropriate regulations] * * *. The courts cannot responsibly mandate flat guideline deadlines when the Administrator *demonstrates* that additional time is *necessary* to insure that the guidelines are rooted in an understanding of the relative merits of available control technologies."

*Id.* at 712 (emphasis added). The court concluded that the "sound discretion of an equity court does not embrace enforcement

---

9. The EPA tries to characterize its argument concerning the appropriate remedy for its breach of a mandatory statutory duty as a material question of fact, making summary judgment inappropriate when there is "no genuine issue as to any material fact * * *." F.R.Civ.P. 56(c). The only factual issue in this case is whether or not the EPA issued final regulations for radion-

uclide emissions within 180 days of the issuance of proposed regulations. The EPA admits that it did not. The argument made by the Agency and the Association goes to the purely equitable issue of how this Court should exercise its power as a chancellor in fashioning a remedy for the EPA's clear violation of the law; this cannot be characterized as a factual dispute.

* * * of a party's duty to comply with an order that calls on him 'to do an impossibility'." *Id.* at 713, *citing Maggio v. Zeitz,* 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948).

The EPA attempts to shift the burden to plaintiff to show that the EPA can in fact comply with the deadline. *See* Def.Br. at 15. Cases following *Train,* however, clearly establish that "the agency [bears] * * * a heavy burden to demonstrate the existence of an *impossibility*" of complying with the statute. *Alabama Power Co. v. Costle,* 636 F.2d 323, 359 (D.C.Cir.1980) (emphasis added). The agency has not met that burden of proof.

The EPA has made some attempt to prove that compliance is "impossible" by submitting the declaration of Glen Sjoblom, Director of the Office of Radiation Programs at the EPA. He asserts that further study and analysis of materials before the EPA requires "several months" more work before final rules can be issued.[10] Some particulars are given, but the thrust of the declaration is really no more than "further study always makes everything better." As the D.C. Circuit has pointed out, a district court must "separate justifications grounded in the purposes of the Act from footdragging efforts of a delinquent agency." *Natural Resources Defense Council v. Train, supra,* 510 F.2d at 713.

Judge Sweigert rejected the EPA's earlier claim that issuance of proposed radionuclide regulations was impossible, relying on Congress' purpose in imposing deadlines for regulation issuance, as the *Train* court instructed. "Congress * * * expressly stated that one of the purposes of Subchapter I of the Act (of which Section 7412 is a part) was to 'accelerate a national research and development program to achieve the prevention and control of air pollution.' 42

U.S.C. § 7401(b)(2)." *Sierra Club v. Gorsuch, supra,* 551 F.Supp. at 787.[11] He then concluded:

"Upon the evidentiary record before us, considered against the time period already passed, the information regarding radionuclides already before the EPA, and the Congressional purpose beyond [sic] Section 7412, this Court finds and concludes that the EPA has not met its heavy burden of demonstrating that it would be infeasible or impossible to issue the proposed regulations within the 180 day schedule proposed by plaintiffs * *."

*Id.* at 789.

The EPA has not demonstrated that timely issuance of final regulations covering radionuclide emissions is impossible, only that it is always easier to do something with more rather than less time. Considering, as Judge Sweigert did, the length of time between Congress' designation in 1977 of radionuclides as a hazardous pollutant and the EPA's issuance of proposed regulations under court order in 1983, and its further delinquency in making final those rules, no justification appears for allowing more "footdragging" by the EPA. "To accept EPA's proposal for further, indefinite, and virtually open-ended extension of the time for compliance, without a more convincing demonstration of evident impossibility, would be to, in effect, repeal the Congressional mandate." *Id.* at 789.

Accordingly,

IT IS HEREBY ORDERED that

1. Plaintiff's motion for summary judgment is granted.

2. The Administrator of the EPA will issue final standards for radionuclide emis-

---

**10.** *See* Declaration of Sjoblom ¶ 12. The Court notes that Mr. Sjoblom's declaration is dated May 10, 1984. Two months have passed without any indication of progress on the issuance of radionuclide regulations by the EPA.

**11.** The purpose of the Clean Air Act is set forth in 42 U.S.C. § 7401(b), which provides in pertinent part:

"The purposes of this subchapter are—
(2) to *initiate and accelerate* a national research and development program to achieve the prevention and control of air pollution." (Emphasis added.)

sions under Section 112 of the Clean Air Act, 42 U.S.C. § 7412, within ninety (90) days from the date of this Opinion and Order.

## ON ORDER OF CONTEMPT

On October 31, 1984, this Court issued an order requiring the Administrator of the Environmental Protection Agency and the Environmental Protection Agency (the "EPA") to show cause why they should not be held in contempt for failure to comply with the Court's Opinion and Order entered July 27, 1984, as amended by the Court's Order of September 17, 1984 (hereinafter both referred to as the "Order"). A contempt hearing was held on November 21, 1984. The Court, after having carefully considered defendants' memorandum of points and authorities in response to order to show cause, the declarations of William Ruckelshaus, Administrator of the EPA, and Richard J. Guimond, an EPA staff person in charge of developing standards for radionuclides for the EPA, the parties' papers, and the oral arguments presented at the contempt hearing, hereby finds defendants in contempt of court.

## I

The history of this suit is chronicled in detail in the Court's Opinion entered July 27 and will be briefly summarized here. In 1977, Congress determined that radionuclides pose a potentially serious health hazard, and amended the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, to require the EPA to investigate radionuclides and to determine whether or not emissions of radionuclides may reasonably be anticipated to endanger public health. 42 U.S.C. § 7422. Under the Act, once the EPA determines that a radioactive pollutant, such as radionuclides, pose a health risk, the EPA is required to list such pollutant on the "hazardous pollutant" list, and to issue emission standards on a timetable fixed by statute. *See* 42 U.S.C. §§ 7412, 7422.

In November 1979, the EPA issued its determination that radionuclides increase the risk of cancer, genetic damage, and death, and added radionuclides to the list of "hazardous pollutants" regulated pursuant to the Act. 42 U.S.C. § 7412. Having made that determination, the EPA was then required by statute to issue proposed regulations establishing emission standards within 180 days of listing radionuclides. *See* 42 U.S.C. § 7412(b)(1)(B). The EPA did not issue the proposed regulations within the 180 days prescribed by statute and in 1982 the Sierra Club sued the EPA and its Administrator to force compliance with the statutory mandate. In that suit, the court found that the EPA had failed to "perform its mandatory statutory duty to issue proposed radionuclide emission standards within 180 days of listing them as a hazardous air pollutant," and required that the proposed regulations be issued. *See Sierra Club v. Gorsuch,* 551 F.Supp. 785, 786, 787 (N.D.Cal.1982). The EPA finally issued proposed regulations on April 6, 1983, approximately *three years* after the mandatory deadline set by statute.

Once proposed regulations are issued, the Act requires the EPA to take one of two options within 180 days of issuance of the proposed regulations. The EPA must either (1) issue final standards for radionuclide emissions, or (2) make a finding on the basis of information presented at hearings during the rulemaking that radionuclides are clearly not a hazardous pollutant. 42 U.S.C. § 7412(b)(1)(B). Contrary to this mandatory scheme, the EPA failed to either issue the final standards or make the requisite finding and delist radionuclides within the 180 day time period. Plaintiff Sierra Club once more sued the EPA and its administrator in order to force the EPA to comply with the nondiscretionary duties imposed upon it by the Act. On July 27, 1984, this Court found that defendants had failed to comply with the Act, granted plaintiff's motion for summary judgment, and ordered the EPA to issue final regulations governing emission standards within 90 days.

Subsequently, the parties moved the Court to amend its July 27 Order. Defendants requested that the Order allow the

EPA to either issue final emission standards or to take any other actions "permitted by law," arguing that its interpretation of 42 U.S.C. § 7412 permits the EPA a host of options not specifically provided for in the statute. Plaintiff requested that the Order be amended to allow the EPA only the two options provided for in the statute, arguing that the basis of the suit surrounded what is "permitted by law" and that the statute clearly gives the EPA only two options.

On September 17, 1984, this Court rejected defendants' expansive interpretation of the governing statute, holding that under the express, unambiguous language of § 7412, the EPA has but two options: to either issue final standards for radionuclide emissions, or find that radionuclides are clearly not a hazardous pollutant based upon the information presented at hearings during the rulemaking. The Court specifically ordered the EPA to exercise one of those two options within 90 days of the Court's July 27 Opinion.[1]

On October 23, 1984, the Administrator of the EPA, while affirming the health risk of radionuclides, signed a Federal Register Notice announcing the EPA's withdrawal of the proposed radionuclide emission standards for three of the four categories of sources for which the EPA had proposed standards.[2] Withdrawal of the proposed regulations absent a finding that radionuclides clearly do not pose a health risk is not one of the options afforded the EPA under the clear language of 42 U.S.C. § 7412 or this Court's Order.

## II

Congress divided jurisdiction to review agency actions pursuant to the Clean Air Act between the district and appellate courts. The district court may enforce nondiscretionary agency actions, 42 U.S.C. § 7604(a); the Court of Appeals for the District of Columbia may review the merits of regulations, including the risks associated with the pollutant, and the adequacy of the date before the EPA in promulating regulations pursuant to the Act, 42 U.S.C. § 7607(b)(1). This Court's jurisdiction, therefore, is limited to determining whether the EPA has complied with the nondiscretionary duties imposed by Congress. In the Order, this Court stated in no uncertain terms what mandatory, nondiscretionary duties are imposed by 42 U.S.C. § 7412: issue final regulations or delist based upon a proper finding that radionuclides do not pose a health hazard. Under the guise of an interpretation of the pertinent statute and the Order, defendants have done neither. Therefore, the only issues presently before this Court are (1) whether defendants are in contempt of this Court's Order, and if so, (2) what actions defendants must take in order to purge the contempt.

## III

Defendants admitted at the contempt hearing that Mr. Ruckelshaus, as Administrator of the EPA, did not issue final regulations or delist radionuclides based upon a proper finding. The thrust of the defendants' argument against finding them in contempt is that the Order only required the EPA "take final action" with regard to its proposed radionuclide emission standards, and that the EPA took final action on October 23, 1984, by withdrawing emission standards for three of the four emission sources.[3] Mr. Ruckelshaus states that

1. The Order of September 17, 1984, reads in pertinent part as follows:

   The Administrator of the EPA will issue final standards for radionuclide emissions *or a finding on the basis of information presented at hearings during the rulemaking, that radionuclides are clearly not a hazardous pollutant,* under Section 112 of the Clean Air Act, 42 U.S.C. § 7412, within ninety (90) days from the date of this Opinion and Order, July 25, 1984.

2. These four categories are: DOE facilities, NRC-licensed facilities, elemental phosphorus plants, and underground uranium mines. The EPA also affirmed its decision not to regulate emissions from five other sources for which no proposed regulations had been issued. These five categories are not part of this lawsuit.

3. The EPA did not issue final regulations or delist radionuclides emitted from uranium mines, but declined to withdraw any proposed regulations as to that source.

his decision to withdraw emission standards for the three sources "viewed by itself, was proper and defensible," and was supported by his legal counsel. *See* Ruckelshaus decl. at 8. Mr. Ruckelshaus states further that his counsel advised him that they believed that they could defend a "reading of Section 112 that would require the Administrator to make * * * either (1) a final decision to issue regulations, or (2) a final decision that no regulation were necessary, or (3) a final decision that the record would not support a decision to regulate." *Id.* at 9.

Regardless of whether the EPA's actions were supported by the opinions of its legal counsel, the Court finds that this argument in justification for the EPA's actions is evasive and unpersuasive. Defendants' interpretation of 42 U.S.C. § 7412, *viewed by itself,* is simply irrelevant. The proper interpretation of § 7412 has been the very essence of this litigation since its inception. The EPA proffered, and vigorously defended, its interpretation of the statute in opposition to plaintiff's summary judgment motion, decided on July 27, 1984, and once again as part of defendants' motion to amend, which culminated in the Order of September 17, 1984. On both occasions, the Court rejected the very interpretation of the statute that is once again being forwarded by the EPA, instead adopting the express and unambiguous language of the statute. Importantly, nowhere in Mr. Ruckelshaus' declaration does he state that he or his counsel believed their actions were a proper and defensible interpretation of the Order.

The statutory language provides the EPA only two options. This Court has already interpreted the statute to mean exactly what it says. The EPA is not entitled to ignore the terms of the Order simply because it differs from the EPA's own interpretation of § 7412. The fact that Mr. Ruckelshaus, as Administrator of the EPA, chose to adopt the legal interpretation of 42 U.S.C. § 7412 that he "thought best" is simply irrelevant, and in no way evidences a good-faith attempt to comply with the Order.[4]

Defendants' second argument against being held in contempt is that the Order is not sufficiently clear so as to be enforceable by contempt. The Order of September 17 reads in pertinent part:

> The Administrator of the EPA will issue final standards for radionuclide emissions *or a finding on the basis of information presented hearings during the rulemaking, that radionuclides are clearly not a hazardous pollutant,* under Section 112 of the Clean Air Act, 42 U.S.C. § 7412, within ninety (90) days from the date of this Opinion and Order, *July 25, 1984.*

It is frankly incomprehensible to the Court that Mr. Ruckelshaus and his counsel at EPA could find ambiguity in the above language.[5] The Order, which closely tracks the language of the statute, clearly and unambiguously sets forth the possible EPA actions. Defendants' argument that the Order is not sufficiently clear so as to be enforceable by contempt is patently meritless.

Finally, defendants attempt to justify the actions taken on a quasi impossibility theory. Defendants assert that Mr. Ruckelshaus could not lawfully comply with the Order because the EPA did not have sufficient time within which to renotice proposed standards for uranium mines, one of the four sources for which proposed regulations were issued. The most obvious weakness of this argument is that it is nonresponsive as to the other three sources

---

4. The fact that the EPA's interpretation of § 7412 has been consistent with the agency since the enactment of the statute is likewise unpersuasive. It is extraordinary to suggest that an agency's interpretation of a statute is somehow elevated to a position of precedence over a district court's interpretation simply by the consistency of the agency's interpretation. The Supreme Court has emphasized that the courts are the final authorities on issues of statutory construction. *See Volkswagenwerke v. Federal Maritime Commission,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968).

5. Indeed, defendants do not specify which terms of the Order are vague.

for which proposed regulations had been issued.

Mr. Ruckelshaus' declaration does not state that there was no possibility of issuing final regulations by the Court-ordered deadline for the sources other than uranium mines. In fact, Richard Guimond, the staff person responsible for directing the EPA's regulatory environmental radiation protection program, specifically recommended that Mr. Ruckelshaus promulgate final standards at levels slightly less stringent than the level proposed for the other three sources. Guimond decl. at 17. According to Mr. Guimond, control technology is readily available to reduce radionuclide emissions from these sources, and developing emission standards is relatively straightforward. *Id.* at 7. Evidently, Mr. Ruckelshaus simply decided to withdraw the proposed standards for the three sources, even against the advice of his principal staff expert.

The Scientific Advisory Board Report ("SAB Report"), which was issued on August 17, 1984, and which reviewed the scientific bases for the EPA's proposed emission regulations, cannot be relied upon as a justification for noncompliance with the Order. While the SAB Report stated several concerns with the EPA's procedures that Mr. Ruckelshaus felt could not be formally resolved within the time that remained to him for decision, the body of the SAB Report "generally supported the assessment and risk estimates made by EPA." *Id.* at 16.

Much of defendants' quasi impossibility arguments are directed toward regulation of uranium mines. The EPA declined to withdraw standards governing radionuclide emissions from uranium mines, but also declined to issue final emission standards. Although the Court is not unsympathetic to the task of promulgating accurate and fair regulations that would withstand judicial review, the difficulty in issuing workable final regulations cannot be a valid excuse for noncompliance with the Order.

The EPA has not demonstrated that timely issuance of final regulations for uranium mines is impossible, only that it would be easier to issue more accurate standards with more time. Indeed, the EPA has been arguing this point with respect to uranium mines since 1982. In response to Judge Sweigert's ruling that the EPA failed to perform its mandatory duty to issue proposed emission standards within 180 days of listing radionuclides as a hazardous air pollutant, the EPA offered to issue such proposed regulations by *1989,* more than nine years after the statutory deadline. *See Sierra Club v. Gorsuch, supra,* 551 F.Supp. at 789. In the instant case, the EPA would not even go as far as to identify a date on which it thought final regulations for uranium mines could be promulgated! When asked how long it would take the EPA to promulgate final emission regulations, EPA's counsel refused to give the Court any time estimate. Unfortunately, Judge Sweigert's 1982 statement has even more validity today: "To accept EPA's proposal for further, indefinite, and virtually open-ended extension of the time for compliance, without a more convincing demonstration of evident impossibility, would be to, in effect, repeal the Congressional mandate." *Id.* Therefore, the difficulty in issuing final regulations for uranium mines does not excuse or justify EPA's failure to comply with the Order.

Civil contempt is characterized by a court's desire to compel obedience to a court's order. *Falstaff Brewing Corp. v. Miller Brewing Co.,* 702 F.2d 770, 778 (9th Cir.1983), *citing Shillitani v. United States,* 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). The contempt must be proven by clear and convincing evidence. *Falstaff, supra,* 702 F.2d at 778 n. 1. For the reasons set forth above, this Court finds defendants William Ruckelshaus, as Administrator of the EPA, and the EPA in contempt.

### IV

In sum, the Clean Air Act imposes mandatory, nondiscretionary duties upon the EPA. This Court has jurisdiction to enforce nondiscretionary agency actions.

42 U.S.C. § 7604(a). In the Court's Opinion and Order of July 27, 1984, as amended on September 17, 1984, the Court rejected defendants' broad interpretation of 42 U.S.C. § 7412, and required the EPA to comply, within 90 days, with the express and unambiguous provisions of that statute.

Defendants have admitted that they have not issued final emission standards, nor delisted radionuclides based upon a proper finding that radionuclides are clearly not a hazardous pollutant. Instead, defendants have argued that their interpretation of the Act should take precedence over this Court's interpretation, that the Court's Order is ambiguous, and that compliance is simply too difficult. Having carefully reviewed the parties' papers, declarations, and oral argument, this Court finds that defendants' arguments are unpersuasive and that there is clear and convincing evidence that defendants are in contempt.

Having found defendants in contempt, this Court must fashion an appropriate remedy. To that end,

IT IS HEREBY ORDERED that defendants must:

1. (a) Issue within 30 days of the filing of this Opinion and Order final radionuclide emission standards for DOE facilities, NRC-licensed and non-DOE federal facilities, and elemental phosphorus plants, and

(b) Issue within 120 days final radionuclide emission standards for uranium mines; OR

2. Make a finding on the basis of the information presented at hearings during the rulemaking, that radionuclides are clearly not a hazardous pollutant.