**SIERRA CLUB, et al., Plaintiffs,**

v.

**State of California,**
**Plaintiff-Intervenor,**

v.

**Lee M. THOMAS, in his official capacity as Administrator of the United States Environmental Protection Agency, Defendant,**

**and**

**Alabama Power Company, et al.,**
**Defendant-Intervenors.**

**No. C-86-0971-WWS.**

United States District Court,
N.D. California.

April 8, 1987.

Deborah S. Reames, Sierra Club Legal Defense Fund, Inc., San Francisco, Cal., Robert E. Yuhnke, Environmental Defense Fund, Boulder, Colo., for plaintiffs.

Rodney Hamblin, Francis Boone, Asst. U.S. Attys., San Francisco, Cal., Lisa F. Ryan, Environmental Defense Section, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

Henry V. Nickel, Andrea Bear Field, Maida O. Lerner, Hunton & Williams, Washington, D.C., Robert A. Goodin, Diane Wear Larrabee, Jane Z. Felder, Armour, St. John, Wilcox, Goodin & Schlotz, San Francisco, Cal., for Alabama Power Co., intervenor.

Andrea Sheridan Ordin, Theodora Berger, Susan L. Durbin, Asst. Atty. Gen., Los Angeles, Cal., for State of Cal., intervenor.

## MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

Plaintiffs have brought this action against defendant Lee M. Thomas, Administrator of the Environmental Protection Agency ("EPA"), to compel him to issue regulations under § 166(a) of the Clean Air Act, 42 U.S.C. § 7476(a), to prevent the significant deterioration of air quality from emissions of nitrogen oxides.[1] Section 166(a) requires EPA to promulgate the regulations within two years of August 7, 1977, but as of this date, almost ten years later, EPA has yet to comply. It now seeks an additional fifty months within which to promulgate the regulations the statute mandates.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1977, Congress enacted a statutory program, Part C, 42 U.S.C. §§ 7470–7479, of Subchapter I of the Clean Air Act, id. §§ 7401–7642, to prevent the significant deterioration of air quality (the "PSD program"). The program applies to areas of the country with ambient concentrations of air pollutants below national ambient air quality standards ("NAAQS"). NAAQS are maximum permissible concentrations of pollutants established by EPA under § 109 of the Clean Air Act, id. § 7409, and are enforced by the states, id. § 7410.

As part of the PSD program, § 163 of the Clean Air Act establishes numerical limits (called "increments") on increases in concentrations of sulfur dioxide and particulate matter ("Set I pollutants"). The size of the increase allowed under § 163 varies according to whether an area subject to the PSD program is a class I, II, or III area under a classification system established by §§ 162 and 164 of the act, id. §§ 7472, 7474. A major new emitting facility may not be constructed in a PSD area without a permit from state enforcement officials. Id. § 7475(a)(1). In order to obtain a permit, the owner or operator of the facility must demonstrate that the emissions from the facility will not result in an increase in pollution in excess of Set I increments. Id. § 7475(a)(3). This demonstration calls for the application of mathematical dispersion models, which predict the impact of new emissions on ambient concentrations of air pollutants.[2] See 40 C.F.R. § 51.24(1).

---

1. Section 166(a) reads as follows:
   In the case of the pollutants hydrocarbons, carbon monoxide, photochemical oxidants, and nitrogen oxides, the Administrator shall conduct a study and not later than two years after August 7, 1977, promulgate regulations to prevent the significant deterioration of air quality which would result from the emissions of such pollutants. In the case of pollu-
   tants for which national ambient air quality standards are promulgated after August 7, 1977, he shall promulgate such regulations not more than 2 years after the date of promulgation of such standards.

2. Dispersion models are also used in the enforcement of NAAQS. See 40 C.F.R. § 51.46.

Nitrogen oxides are also subject to PSD regulation. Nitrogen oxides pollution has been identified as a likely cause of acute respiratory diseases, H.R.Rep. No. 294, 95th Cong., 1st Sess. 109–10, *reprinted in* 1977 U.S.Code Cong. & Admin.News 1077, 1188, and cancer, *id.* at 114, 1977 U.S.Code Cong. & Admin.News at 1192, and is known to cause acid rain, *id.* at 130, 1977 U.S.Code Cong. & Admin.News at 1209. Congress did not establish increments for nitrogen oxides, but instead in § 166(a) of the Clean Air Act required EPA to promulgate regulations to prevent significant deterioration in air quality from emissions of nitrogen oxides and other specified pollutants ("Set II pollutants").[3]

Congress provided that PSD regulations for Set II pollutants need not include an area classification system like that established for Set I pollutants. Section 166, however, establishes several other criteria for Set II PSD regulations. They must (1) fulfill the purposes of the Clean Air Act and the PSD program,[4] 42 U.S.C. § 7476(c), (2) include "specific numerical measures against which permit applications may be evaluated," *id.*, (3) provide a "framework for stimulating improved control technology," *id.*, (4) protect air quality values, *id.*, and (5) establish "specific measures at least as effective as the increments established for Set I pollutants," *id.* § 7476(d). The statute requires EPA to issue regulations not later than two years after August 7, 1977. *Id.* § 7476(a).

The statutory PSD program is in part a codification of an earlier court-ordered PSD program. In 1972, a district court determined that the Act's statement of purpose in § 101(b), *id.* § 7401(b), required state implementation plans to include measures to insure the "non-degradation of existing clean air." *Sierra Club v. Ruckleshaus,* 344 F.Supp. 253, 256 (D.D.C.), *aff'd,* 4 Env't Rep.Cas. 1815 (D.C.Cir.1972), *aff'd by an equally divided court,* 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973). In 1974, EPA promulgated regulations amending state plans to include PSD standards. 39 Fed.Reg. 42,510 (1974). The basic structure of the 1974 PSD program was the same as that of the present statutory PSD program.

From 1979 to 1981, EPA took steps toward promulgating a PSD regulatory program for all four Set II pollutants: ozone, carbon monoxide, lead, and nitrogen oxides. In 1980, EPA published an advance notice of proposed rule making which solicited public comments on ten alternative PSD Set II programs. 45 Fed.Reg. 30088 (1980).

---

3. Set I and Set II pollutants are referred to collectively as "criteria pollutants."

4. The purposes of the Clean Air Act are:

   (1) to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population;

   (2) to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution;

   (3) to provide technical and financial assistance to State and local governments in connection with the development and execution of their air pollution prevention and control programs; and

   (4) to encourage and assist the development and operation of regional air pollution control programs.

42 U.S.C. § 7401(b).

The purposes of the PSD program are:

   (1) to protect public health and welfare from any actual or potential adverse effect which in the Administrator's judgment may reasonably be anticipate to occur from air pollution or from exposures to pollutants in other media, which pollutants originate as emissions to the ambient air), notwithstanding attainment and maintenance of all national ambient air quality standards;

   (2) to preserve, protect, and enhance the air quality in national parks, national wilderness areas, national monuments, national seashores, and other areas of special national or regional natural, recreational, scenic, or historic value;

   (3) to insure that economic growth will occur in a manner consistent with the preservation of existing clean air resources;

   (4) to assure that emissions from any source in any state will not interfere with any portion of the applicable implementation plan to prevent significant deterioration of air quality for any other State; and

   (5) to assure that any decision to permit increased air pollution in any area to which this section applies is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decision-making process.

*Id.* § 7470.

Sixty-five comments were received. In addition, EPA hired outside contractors to aid it in developing a regulatory package. These contractors identified five tasks involved in preparing the package: (1) describing and evaluating various regulatory alternatives, (2) testing the alternatives in several geographic regions, (3) completing a detailed regulatory analysis, (4) preparing an environmental impact statement, and (5) preparing a draft regulatory package. By February 1981, EPA and the contractors had completed tasks one and two. In a report to EPA, the contractors set a four-month schedule for completing the remaining tasks. EPA determined that it would need an additional two months for internal review of the proposal and then ten months to proceed from proposed to final rule making. *See* 46 Fed.Reg. 23705 (1981). In October 1981, EPA, without explanation, announced that it had cancelled the PSD Set II rule making. 46 Fed.Reg. 54036 (1981). It has taken no action to comply with its statutory duty since that time.

On March 4, 1986, plaintiffs filed suit under 42 U.S.C. § 7604 to compel EPA to comply with its statutory duty to issue PSD regulations for nitrogen oxides. On April 14, 1986, the Court granted the motion to intervene of Alabama Power Company, *et al.*, members of an ad hoc group of utilities ("Power Companies"). On August 5, 1986, the Court granted the State of California ("California") leave to intervene. On October 14, 1986, the Court issued an order requiring the parties to submit evidence supporting their positions as to the length of time to be allowed to defendant to promulgate PSD regulations for nitrogen oxides. The order provided that the time frame for compliance ultimately established by the Court would begin to run on October 9, 1986.

### DISCUSSION

It is undisputed that EPA has failed to comply with § 166 and that plaintiffs are entitled to an injunction compelling EPA to perform its statutory duties. The sole question presented therefore is on what terms relief is to be granted, i.e. within what time must EPA promulgate PSD regulations for nitrogen oxides? Plaintiffs contend that defendant must promulgate regulations within the statutory time frame, since defendant has not demonstrated that doing so would be impossible or infeasible. Defendant argues that the Court has discretion in exercising its equitable powers to mandate a reasonable period of time in excess of that allowed by the statute. Defendant proposes a fifty-month schedule and argues that it cannot reasonably issue the regulations in a lesser amount of time.

Plaintiffs' statement of the governing standard is correct. Plaintiffs derive that standard from *Natural Resources Defense Council v. Train*, 510 F.2d 692 (D.C.Cir. 1975), the leading case on the subject of agency failure to meet statutory deadlines. In *Train*, the Natural Resources Defense Council brought suit to compel EPA to issue effluent limitation guidelines under the Clean Water Act, which required issuance of the guidelines within one year of its October 1972 enactment. In November 1973, one month after the deadline had passed, the district court ordered EPA to issue the guidelines for all point sources of effluent pollutants within one year. The court of appeals upheld the district court's decree to the extent it applied to point sources identified in the statute, but determined that guidelines for other point sources were not due until December 31, 1974. *Id.* at 704–10.

■ Since the EPA indicated that it might not be able to meet even this deadline for some point sources, the court of appeals provided the district court with guidance on remand for evaluating requests for delay. The court identified "two types of restraints which might delay the formulation of adequate guidelines":

First, it is possible that budgetary commitments and manpower demands required to complete the guidelines by December 31 are beyond the agency's capacity or would unduly jeopardize the implementation of other essential programs. Second, EPA may be unable to conduct sufficient evaluation of available

control technology to determine which is the best practicable.... *Id.* at 712. The court noted that "[t]he sound discretion of an equity court does not embrace enforcement through contempt of a party's duty to comply with an order that calls for him 'to do an impossibility.'" *Id.* at 713 (quoting *Maggio v. Zeitz,* 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948)). In exercising its discretion, however, the district court must consider whether "the official involved ... has in good faith employed the utmost diligence in discharging his statutory responsibilities." *Id.* The district court should carefully scrutinize claims that delay is necessary, "since officials may seize on a remedy made available for extreme illness and promote it into the daily bread of convenience." *Id.*

■ Several courts have applied *Train* to cases involving EPA delays in issuing Clean Air Act regulations. They have held that EPA is obligated to issue regulations within the statutory time frame unless it demonstrates that doing so is impossible or infeasible for one of the reasons identified in *Train.* *Sierra Club v. Ruckleshaus,* 602 F.Supp. 892, 898 (N.D.Cal.1984); *New York v. Ruckelshaus,* 21 Env't Rep.Cas. (BNA) 1721, 1723 (D.D.C.1984); *State of New York v. Gorsuch,* 554 F.Supp. 1060, 1064 (S.D.N.Y.1983); *Sierra Club v. Gorsuch,* 551 F.Supp. 785, 788 (N.D.Cal.1982).[5] These cases also make it clear that if the statutory deadline has passed by the time the court issues its decree, the EPA remains obligated to issue regulations within the time frame mandated by Congress. If, for example, the Act requires EPA to adopt regulations within 180 days of a particular date and that deadline passes without EPA taking any action, the court, in the absence of a showing of impossibility, will order EPA to issue regulations in 180 days. *See Sierra Club v. Gorsuch,* 551 F.Supp. 785. Congress's determination that the issuance of regulations should occur within a particular period of time thus limits the Court's discretion in fashioning an equitable remedy. *State of New York v. Gorsuch,* 554 F.Supp. at 1062.[6]

■ The burden on an agency of establishing impossibility or infeasibility of issuing regulations within the statutory time frame is heavy. *New York v. Rucklesh-*

---

5. Two cases have held that in mandating EPA compliance with a statutory duty to issue regulations, a court must accept EPA's proposed schedule, if the EPA demonstrates that it is proceeding in good faith. *Environmental Defense Fund v. Thomas,* 627 F.Supp. 566, 569 (D.D.C.1986); *State of Illinois v. Costle,* 12 Env't Rep.Cas. (BNA) 1597 (D.D.C.1979). These cases, however, misconstrue *Train.* In that case, the court stated that a "court may forebear the issuance of an order in those cases where it is convinced by the official involved that he has in good faith employed the utmost diligence in discharging his statutory responsibilities." 510 F.2d at 713. That sentence does not impose a pure good faith standard, as these district courts apparently believed, but clearly requires the agency to demonstrate that it is proceeding with "utmost diligence." *See also State of New York v. Gorsuch,* 554 F.Supp. at 1065 n. 4 ("If the administrator could possibly have have complied with the statutory mandate, but did not because of competing concerns or other decisions on his part, then he is not acting in 'good faith'....").

6. Power Companies cite *United Steelworkers of America v. Rubber Mfrs. Ass'n,* 783 F.2d 1117 (D.C.Cir.1986), for the proposition that courts must defer to an agency's determination of how long rule making will take. In that case, Congress had not established a clear deadline for the rule making in question. Instead of applying a statutory directive, the court was called upon to determine if rule making had been unreasonably delayed under the Administrative Procedure Act, 5 U.S.C. § 706(1). Where, as here, Congress has established a clear time frame for regulatory action, deferring to the agency is inappropriate.

*National Congress of Hispanic American Citizens v. Marshall,* 626 F.2d 882 (D.C.Cir.1979), also relied upon by Power Companies, is equally inapposite. In that case the court held that the statutory deadlines in the Occupational Health and Safety Act for promulgating workplace health and safety standards were not mandatory. Courts have uniformly held, however, that Clean Air Act deadlines are mandatory. That the deadline in § 166 in particular is mandatory is made clear in the legislative history: "If the Administrator finds that establishing and implementing significant deterioration regulations for [Set II pollutants] would present special difficulties or problems of practicality, he is required to report to Congress. This report shall not act to stay the Administrator's duty to proceed with these regulations." H.R.Conf.Rep. No. 564, 95th Cong., 1st Sess. 151, *reprinted in* 1977 U.S.Code Cong. & Admin.News 1502, 1532.

aus, 21 Env't Rep.Cas. (BNA) at 1723. It is especially heavy where, as here, the agency has failed to demonstrate any diligence whatever in discharging its statutory duty to promulgate regulations and has in fact ignored that duty for several years. At the same time, the public interest in a case such as this is of paramount importance. Since the public interest would be ill-served by unworkable PSD regulations which would not survive judicial review, it would be inappropriate to set an infeasible schedule in order to punish a delinquent agency. *See United Steelworkers*, 783 F.2d at 1120. The Court has therefore given defendant's justifications for delay careful consideration. The Court is satisfied that defendant has not met its burden of establishing impossibility or infeasibility, that promulgation of PSD regulations for nitrogen oxides within the statutory time frame established by § 166 is feasible, and that further hearing is unnecessary.

■ In support of its argument in favor of a fifty-month schedule for issuing PSD regulations for nitrogen oxides, defendant has offered the declaration of Gerald A. Emison ("Emison"), the present director of the Office of Air Quality Planning and Standards of EPA. The bulk of Emison's declaration is directed toward establishing that EPA could not "conduct sufficient evaluation" of regulatory alternatives within a lesser amount of time. *See Train*, 510 F.2d at 712. He contends that § 166 presents EPA with an unusually difficult regulatory task. The statutory criteria, according to Emison, are numerous and complex. And because § 166 leaves to EPA the tasks of determining what degree of deterioration is significant and what form the limitations on deterioration should take,

it requires EPA to make policy decisions in addition to the technical and scientific assessments EPA usually confronts.

Plaintiffs, however, have offered the declaration of David G. Hawkins ("Hawkins"), a former Assistant Administrator for Air, Noise, and Radiation at EPA, who points out that EPA in the past has completed regulatory tasks of similar complexity in approximately two years, the time allotted by § 166. One of these, the original PSD rule making under court order, required EPA to make policy determinations of the kind required under § 166 without the benefit of any guidance from Congress. In twenty-five months EPA issued final PSD regulations for several pollutants, not just the one involved here. In addition to "specific numerical measures against which permit applications [might] be evaluated" for sulfur dioxide and particulate matter, the original regulations included a requirement that permit applicants use the "best available control technology" for all criteria pollutants, a feature which is already part of the current PSD regulations. *See* 40 C.F.R. § 51.24(j)(2). EPA's past expedition in adopting these and other[7] regulations is persuasive evidence that compliance with § 166 is feasible.

■ Emison points to uncertainties which allegedly add to the complexity of this rule making. First, he maintains that EPA has "at best only rough estimates of potential future growth in" nitrogen oxides emissions. But the declaration of Gary Rubenstein, partner in an air quality consulting firm, submitted on behalf of California, notes that emissions of nitrogen oxides are among the easiest to forecast of all criteria pollutants because they originate almost exclusively from one source, the combustion of fossil fuels. Second,

---

7. Other complex rule makings completed by EPA in approximately two years include the promulgation of the NAAQS for lead, the revised NAAQS for ozone, and the new source performance standards for fossil-fueled electric utility plants. Emison argues that the complexity of these tasks is not comparable to that of the PSD rule making for nitrogen oxides, because these earlier tasks did not involve EPA in policymaking. These past rule makings were, however, daunting in other ways. In upholding the final lead standards, the District of Columbia Circuit Court of Appeals underscored "the novelty and complexity of the issues that had to be resolved." *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1184 (D.C.Cir.), *cert. denied*, 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980). The new source performance standards for fossil-fueled electric utility plants had an enormous economic impact. *See Sierra Club v. Costle*, 657 F.2d 298, 329 n. 104 (D.C.Cir.1981).

Emison points out that because of nitrogen oxides' highly reactive nature, mathematical dispersion models for that pollutant are unreliable. As a result, EPA will not be able simply to establish increments such as those for Set I pollutants, but will have to consider a number of alternative regulatory schemes.[8] The original PSD rule making, however, required similar efforts. In its notice of proposed rule making for the original PSD program, EPA solicited comments on four alternative regulatory schemes. 38 Fed.Reg. 18986, 18986, 18990–93 (1973). In addition, the notice stated that the EPA had given "careful consideration" to "a variety of other plans." *Id.* at 18993. The uncertainties EPA will encounter in this rule making thus do not appear to be unusually great.

█ Emison argues that comparison of the PSD rule making for nitrogen oxides to rule-making efforts which took place in the 1970s is misleading because of the "more complex reality of environmental rule making in the 1980s." He points to rule-making efforts similar to those which took two years in the 1970s and notes that they will require five to seven years in this decade. But simply because EPA has developed the habit of taking longer to complete its rule makings does not mean that shorter schedules are infeasible. Emison also relies on the need to respond to public comments; but he offers no evidence that public comments now are generally more extensive than in the 1970s. Moreover, as Hawkins points out, the first proposed rule making for a PSD program for all Set II pollutants received fewer comments than other contemporary rule making. In addition, Emison notes that the courts require agencies to take a "hard look" at all regulatory alternatives and all relevant factors before promulgating regulations. The hard look doctrine, however, has been in existence since the early 1970s. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823,

28 L.Ed.2d 136 (1971). The District of Columbia Circuit Court of Appeals applied the hard look doctrine to and ultimately upheld all of the regulatory efforts identified by Hawkins as examples of complex rule making which took approximately two years. *See Sierra Club v. Costle,* 657 F.2d 298 (D.C.Cir.1981) (new source performance standards for fossil-fueled electric utility plants); *Lead Indus. Ass'n v. EPA,* 647 F.2d 1130 (D.C.Cir.) (NAAQS for lead), *cert. denied,* 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980); *Sierra Club v. EPA,* 540 F.2d 1114 (D.C.Cir.1976), *vacated,* 434 U.S. 809, 98 S.Ct. 40, 54 L.Ed.2d 66 (1977) (vacated and remanded court of appeals decision in light of Congress's adoption of statutory PSD program).

█ Finally, Emison identifies recently imposed statutory requirements which make rule making more complex than in the past. Section 317 of the Clean Air Act, 42 U.S.C. § 7617, requires EPA to conduct an economic impact assessment of substantially all regulations. The Regulatory Flexibility Act, 5 U.S.C. §§ 601–612, requires agencies to examine the impact of regulations on small businesses and minimize anticompetitive effects. And the Paperwork Reduction Act, 44 U.S.C. §§ 3501–3520, requires agencies to rationalize the collection of information from the public and to obtain approval of the Office of Management and Budget before imposing any information demands. Section 317, however, requires only that the economic impact assessment be "as extensive as practicable ... taking into account the *time* and resources available to EPA." 42 U.S.C. § 7617(d) (emphasis added). It specifically provides that it shall not be construed to preclude EPA from carrying out its responsibilities under the Clean Air Act. *Id.* § 7617(e). The Regulatory Flexibility Act allows an agency to forego the analysis required by the act, if "the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substan-

---

8. Mathematical dispersion models are adequate for the enforcement of the nitrogen dioxide NAAQS, according to Emison, because "most areas are sufficiently below the national standards that a rough, conservative approximation will suffice...." The enforcement of increments, on the other hand, would call for "fine judgments about the impact of new [nitrogen oxides] emissions on existing ambient concentrations of" nitrogen dioxide.

tial number of small entities." 5 U.S.C. § 605(b). Hawkins declares that EPA is likely to be able to provide that certification for the nitrogen oxides PSD regulations. In addition, the act allows an agency to delay completing the required analysis for 180 days past the date of promulgation. The requirements imposed by these provisions are not particularly onerous and do not justify delay in promulgating the PSD regulations.

■ In addition to these specific complicating factors, Emison offers the vague generalization that "there is now an enhanced appreciation for the complexity of the scientific and technical underpinnings, and the far-reaching effects, of environmental regulation." That delphic pronouncement is insufficient to support a finding of impossibility. EPA has offered no hard evidence that it will be unable to give adequate consideration to the scientific and technical problems involved in the PSD rule making if it is limited to two years. EPA's litany that "further study always makes everything better," *Sierra Club v. Ruckleshaus*, 602 F.Supp. 892, 899 (N.D.Cal.1984), has become familiar to the courts but has never been persuasive, *see, e.g., id.; Sierra Club v. Gorsuch*, 551 F.Supp. 785, 788–89 (N.D.Cal.1982).

■ Defendant also attempts to show that "budgetary commitments and manpower demands required to complete" the regulations "would unduly jeopardize the implementation of other essential programs." *Train*, 510 F.2d at 712. Emison states that EPA's entire current budget is devoted to other important projects and that a timetable of less than fifty months would force EPA to divert resources from those projects. Hawkins points out, however, that shifting resources in response to statutory requirements and court orders is commonplace for EPA. Defendant offers no evidence that the adjustments a two-year time frame would impose would be impossible to carry out.

■ Both sides devote extensive argument to the issue of whether promulgation of the PSD regulations is urgent. That question is irrelevant. *Sierra Club v. Ruckleshaus*, 602 F.Supp. at 897. Congress has set the time frame for promulgating the regulations. The only question facing the Court is whether promulgation within that period is feasible.[9]

■ Plaintiffs and California argue that promulgation of PSD regulations for nitrogen oxides may be accomplished in a shorter period of time than that provided in § 166. Plaintiffs advocate a seventeen-month, California a twenty-month, schedule. It is not for the Court, however, to determine the briefest possible time frame for completing the rule making. Congress has already determined that two years is an appropriate period. Moreover, the fact that EPA took steps toward completion of the rule making in 1979 to 1981 does not alter this conclusion. Emison has established that because of changed circumstances EPA cannot simply pick up where it left off.

---

9. In attempting to minimize the importance of the PSD regulations for nitrogen oxides, defendant and Power Companies misrepresent the Congressional purpose in enacting the PSD program. Emison states that "these regulations carry the potential of imposing substantial burdens on new economic growth and on government agencies in order to fulfill objectives that are oriented mostly towards human welfare, as opposed to health." Power Companies' reply brief states that PSD regulations "are not rules to protect the public health."

Congress clearly had a different conception of the PSD program's purpose. The House of Representatives committee report on the program noted that the NAAQS for criteria pollutants do not provide a reliable "margin of safety" for protecting the public health, H.R.Rep., *supra*, at 106, 1977 U.S.Code Cong. & Admin.News at 1185, in part because no reliable "no-effects threshold" for criteria pollutants can be identified, *id.* at 110–12, 1977 U.S.Code Cong. & Admin.News at 1188–90. The report identified numerous potential adverse health consequences from criteria pollutants against which NAAQS provide inadequate protection. *Id.* at 112–128, 1977 U.S.Code Cong. & Admin.News at 1190–1206. The report concluded that "because ... increased pollution brings an increase in the risk of adverse health effects for many members of a community, the prospect of greatly increased pollution levels in presently clean air areas must not be taken lightly."

The Court has already determined that EPA's time for completing the rule making would start to run on October 9, 1986. Defendant states that EPA has been proceeding under the assumption that it would have fifty months from that date. Given the clear Congressional mandate and the absence of proof of impossibility, there was no foundation for that assumption. Nevertheless, since the purpose of this order is to protect the public interest and not to punish EPA, the Court would extend EPA's time to compensate for its footdragging if it were convinced that doing so was necessary for the promulgation of workable regulations. But the evidence indicates that an extension is not necessary. The old schedule for the PSD rule making gave EPA fourteen months from the date a study of regulatory alternatives was completed to promulgate final regulations. If that schedule were followed, EPA would have to have its study completed by August 9, 1987 in order to meet an October 9, 1988 deadline. EPA's fifty-month schedule provides that EPA will have the study completed by September 1987. EPA now has sufficient notice to reduce the time to be taken for the study by one or two months.

In order to assure compliance with this order, the Court will retain jurisdiction and will set an interim date by which EPA must publish proposed regulations. Power Companies argue that the Court should require EPA to "take final rule making action" rather than promulgate final regulations, because EPA could determine that existing emissions limitations constitute an adequate PSD program for nitrogen oxides. The statute, however, clearly requires EPA to "promulgate regulations." 42 U.S.C. § 166(a).

Accordingly, defendant is directed to publish proposed regulations for nitrogen oxides in accordance with § 166(a) of the Clean Air Act by February 9, 1988 and to promulgate final regulations for nitrogen oxides in accordance with § 166(a) of the Clean Air Act by October 9, 1988. Defendant is further directed to render an interim progress report to the Court and plaintiffs on August 28, 1987 at 10 a.m.

This case is the most recent instance of the EPA's long-standing unwillingness to comply with the Clean Air Act. This Court has had to issue orders against the EPA on at least two prior occasions including an order holding the Administrator in contempt. Congress had made it clear that if the EPA encounters special difficulties or problems of practicality, EPA must report to Congress. H.R.Conf. Rep., *supra*, at 151, 1977 U.S.Code Cong. & Admin.News at 1532. In the absence of a showing of impossibility, EPA must look to Congress, not this Court, for an extension of time. Defendant is hereby placed on notice that failure to comply with the terms of this order will not be tolerated, and that in the event of such a failure, the Court will promptly issue an order to show cause why Administrator Thomas should not be held in civil contempt and subjected to appropriate sanctions pending full compliance.

The Court retains jurisdiction to make such orders as may be necessary or appropriate.

IT IS SO ORDERED.