898 F.2d 183
 31 ERC 1167, 283 U.S.App.D.C. 169, 20
Envtl. L. Rep. 20,577
 ENVIRONMENTAL DEFENSE FUND, INC., Petitioner,
v.
ADMINISTRATOR OF THE UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY, Respondent,
Alabama Power Company, et al., Standard Alaska Production
Company, American Mining Congress, Intervenors.
 No. 88-1882.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 6, 1989.
Decided March 13, 1990.
As Amended March 13, 1990.
 
 Robert E. Yuhnke, for petitioner.
 Craig D. Galli, Atty., Dept. of Justice, with whom Peter R. Steenland, Jr., Acting Deputy Asst. Atty. Gen., Dept. of Justice, Washington, D.C., and Gregory B. Foote, Atty., E.P.A., were on the brief for respondents.
 Robert T. Connery, J. Peter Luedtke and Adelia S. Maddox, Washington, D.C., for American Mining Congress, Henry V. Nickel, Andrea Bear Field and Mel S. Schulze, Washington, D.C., for Alabama Power Co., et al., were on the brief for intervenors, American Mining Congress, et al. Adelia S. Maddox, Washington, D.C., and Edward M. Green, also entered appearances for American Mining Congress.
 Alfred V.J. Prather, Edwin H. Seeger and Kurt E. Blase, Washington, D.C., entered appearances for intervenor, Standard Alaska Production Co.
 Before WILLIAMS and SENTELLE, Circuit Judges, and ROBINSON, Senior Circuit Judge.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 In its 1977 amendments to the Clean Air Act, Congress ratified a previously established program[1] for the "prevention of sig nificant deterioration of air quality." See Sec. 127, Pub.L. No. 95-95, 91 Stat. 685, 731-42, adding to the Act Secs. 160-69, codified at 42 U.S.C. Secs. 7470-79 (1982). The stated purpose of these "PSD" provisions was (roughly) to protect the air quality in national parks and similar areas of special scenic or recreational value, and in areas where pollution was within the national ambient standards, while assuring economic growth consistent with such protection. Clean Air Act Sec. 160, 42 U.S.C. Sec. 7470. For two pollutants, sulfur dioxide and particulate matter ("Set I pollutants"), Congress followed the Environmental Protection Agency's earlier approach, fixing a maximum allowable increase (an "ambient air quality increment") over baseline concentrations.[2] See Sec. 163, 42 U.S.C. Sec. 7473; compare prior rules, Prevention of Significant Air Quality Deterioration, 39 Fed.Reg. 42,510, 42,514-17 (1974). For several other pollutants ("Set II pollutants"), including nitrogen oxides, Congress took no immediate action. Instead it provided the EPA with general guidance as to regulations that it was to promulgate within two years. Sec. 166, 42 U.S.C. Sec. 7476. We deal here with the regulations governing nitrogen oxides, the only Set II pollutant that EPA has yet regulated. The case turns on the meaning, and above all the interrelationship, of the two main guides, Sec. 166(c) and (d):
 
 
 2
 (c) Such regulations shall provide specific numerical measures against which permit applications may be evaluated, a framework for stimulating improved control technology, protection of air quality values, and fulfill the goals and purposes set forth in section 7401 of this title [statement of purposes of Clean Air Act] and section 7470 of this title [statement of purposes of the PSD provisions].
 
 
 3
 (d) The regulations ... shall provide specific measures at least as effective as the increments established in section 7473 of this title [the Set I rules] to fulfill such goals and purposes, and may contain air quality increments, emission density requirements, or other measures.
 
 
 4
 Sec. 166(c), (d), 42 U.S.C. Sec. 7476(c), (d). Because the EPA did not adequately consider the requirements of subsection (c), we reverse.
 
 I. An Overview of the Regulatory Scheme
 
 5
 Although in 1980 the EPA noted ten possible strategies for Set II, see Prevention of Significant Deterioration for Hydrocarbons, Carbon Monoxide, Nitrogen Oxides, Ozone, and Lead (PSD Set II) (Advanced Notice of Proposed Rulemaking), 45 Fed.Reg. 30,088 (1980) ("Advanced Notice"),[3] it ultimately decided to mimic Congress's approach for Set I. The first step, not here controverted, was the use of the same three-tiered scheme for classifying protected areas: Class I--comprising mainly large national parks and national wilderness areas; Class II--regions where the ambient air quality levels more than meet the national standards; and Class III--regions meeting the definition of Class I or Class II areas but redesignated at the behest of a state for higher levels of industrial development. Secs. 162, 164, 42 U.S.C. Secs. 7472, 7474; compare Prevention of Significant Deterioration for Nitrogen Oxides ("Proposed Rules"), 53 Fed.Reg. 3698, 3699/2-3 (1988) (noting statutory classifications and adopting them for Set II). (According to the EPA, no Class III areas have been established to date. Id.; Brief for Respondent at 11.)
 
 
 6
 EPA's second step, again not controverted here, was its decision to base the nitrogen oxide PSD program on "ambient air quality increments" similar to those for the Set I pollutants.[4] Though Congress contemplated that EPA might use increments for the Set II program, it did not require their use. See Sec. 166(d), 42 U.S.C. Sec. 7476(d). EPA tentatively rejected the alternatives to increments that it had considered in its 1980 Advanced Notice, but left the door open for a state to adopt an alternative strategy if it could show that its choice was as effective as EPA's. See Proposed Rules, 53 Fed.Reg. at 3709/2.
 
 
 7
 EPA's third step was to formulate the permissible increments "by reference to" the National Ambient Air Quality Standards ("NAAQS" or "ambient standards") established under Sec. 109 of the Clean Air Act, 42 U.S.C. Sec. 7409. In so doing, it rested on its view that Congress had used the ambient standards "as the benchmark for determining what constitutes 'significant deterioration' " for Set I pollutants and that the ambient standards were "the basic measure of air quality under the Act." See Proposed Rules, 53 Fed.Reg. at 3700/3. The three challenged aspects of the nitrogen oxide PSD program stem directly from this decision.
 
 
 8
 First, though by its terms Sec. 166 demands that the regulations cover "nitrogen oxides," the EPA regulated only one nitrogen oxide compound, nitrogen dioxide or NO2 , as this is the only compound for which it had established an ambient standard.[5] Second, as its ambient standard for NO2 imposes direct limits only for the annual average concentration, EPA defined the permissible increments only in terms of an annual average. Final Rules, 53 Fed.Reg. at 40,660/3. Short-term concentrations, which are only indirectly and incompletely limited by an annual average, may have adverse health and welfare effects (see, e.g., EDF Comments at 18 (noting high concentration "acid pulse" of nitric acid in springtime can cause ecological damage)), but EPA at present appears to believe the evidence too uncertain to justify including a short-term limit among the ambient standards for NO2 . See Retention of National Ambient Air Quality Standards for Nitrogen Dioxide, 50 Fed.Reg. 25,532, 25,536/3 (1985). Third, and most sharply contested, the EPA set the permissible increments of nitrogen dioxide at the same percentage of the nitrogen dioxide ambient standard as the percentage that the Set I increments were of their annual ambient standards (at the lower of the two percentages when they varied). The table below sets forth the lower of the primary and secondary national ambient air quality standards[6] for Set I and II pollutants at the time the increments for each were created (date in parentheses), and the increments for the pollutants both as absolute concentrations and as percentages of the ambient standards (in parentheses). Both standards and increments are expressed in micrograms per cubic meter.[7]
 
 
 9
 II. The Interrelation of Subsections (c) and (d)
 
 
 10
 EDF's most critical objection is that EPA's construction of Sec. 166 collapsed subsection (c)'s general "goals and purposes" standard into subsection (d)'s requirement that the Set II restrictions be "at least as effective ... to fulfill such goals and purposes" as the ones adopted by Congress for Set I. The agency's logic was that by virtue of the "at least as effective" test, the percentages implicit in the Set I restrictions[8] could serve "as a proxy for all the PSD purposes set forth in the statute." Proposed Rules, 53 Fed.Reg. at 3701/2. Although we regard the ultimate fitting together of subsections (c) and (d) as a complex task on which the EPA necessarily deserves much leeway, its approach so far falls short of reasoned decisionmaking. To explain why, we will sift through some possible readings of the subsections and possible relations between them.
 
 
 11
 First, there are at least three possible meanings to subsection (d)'s "at least as effective" test. The EPA, with some hesitation, appears to have read it as requiring that the Set II rules be at least as stringent as those for Set I, i.e., that increments be set no lower, as percentages of a pollutant's ambient standards, than the Set I increments were as percentages of their respective ambient standards. See Proposed Rules, 53 Fed.Reg. at 3701/1. (EDF appears at times to accept this basic formulation. EDF Comments at 19.)[9] Proposed Rules, 53 Fed.Reg. at 3700/3. A second possible meaning is that the Set II rules must be at least as protective of the various environmental values threatened as the Set I increments were of the environmental values threatened by those pollutants. See id. at 3701/3 (asking whether statute should be read as calling for assessment of severity of effects of the pollutants). (EDF supports this reading, but realizes it is subsumed under its argument based on Sec. 166(c). Brief for Petitioner EDF at 45.) Finally, there is a literal interpretation, for the most part overlooked by both parties, under which the Set II rules would have to achieve as optimal a balancing of the environmental and economic growth values made relevant by Sec. 160 as Congress achieved for the Set I pollutants. The agency recognized that the PSD program necessarily involved a balancing of goals, see Proposed Rules, 53 Fed.Reg. at 3699/1, and to a degree assessed its NO2 increments in terms of effectiveness in "avoiding unreasonable economic impacts" on adversely affected industries, see id. at 3704/1-2, but it did not attempt to use optimality as an ultimate measuring stick.
 
 
 12
 The more faithful any of these views is to the literal meaning of the "goals and purposes" with respect to which effectiveness is to be measured, the less workable it is. Thus, while the "optimality" standard appears best to reflect the wording, its practical difficulties are breathtaking. First, it would entail gathering data about not only the Set II pollutants but also those of Set I. On even so narrow an issue as acid rain effects, the EPA made a comparison, see Final Rules, 53 Fed.Reg. at 40,661/1-2, but concluded that a more comprehensive comparison was impossible given the current data, id. at 40,661/2. Second, there are two Set I pollutants, and the optimality of the congressionally adopted balance for the two may differ. Third, it is hard even to imagine a conceptual apparatus for evaluating optimality. Would the EPA identify the ratio of marginal trade-off between environmental and "growth" values for the Set I pollutants at which those increments maximized "utility" (e.g., one util of environment equals two utils of growth, thus giving the environment a two-to-one predominance), and then replicate it for the Set II pollutants? And how would the two different types of utility be measured? The "protectiveness" reading of subsection (d) escapes the extreme intractability of the optimality reading, but it accomplishes this only by slighting the "economic growth" goal of Sec. 160. Moreover, it is also far from readily workable: how can degrees of protectiveness be established for two pollutants that inflict their primary harms on different environmental values (e.g., one most injures visibility, the other vegetation)? The "stringency" reading is the most workable, but at the price of using ambient concentration percentages as a proxy for all the relevant goals. Proposed Rules, 53 Fed.Reg. at 3701/2.
 
 
 13
 Nonetheless, the simple "stringency" reading of Sec. 166(d) is well supported by the legislative history of the 1977 Amendments. The House bill made no distinction between Set I and Set II pollutants in defining increments; it set them all as simple percentages of the ambient standards for each pollutant covered by ambient standards (2% for Class I areas, 25% for Class II, 50% for Class III). See H.R. 6161, 95th Cong., 1st Sess. Sec. 108(a), at 294-95 (April 6, 1977), reprinted in 4 Legislative History at 2281-82. But for the Set II pollutants, the House bill would have allowed the states to supplant the proposed statutory increments with a program of their own design so long as the Administrator determined that it "carr[ied] out the purposes [of the PSD program] at least as effectively as" the statutory program. See id. Sec. 108(a), at 308, reprinted in 4 Legislative History at 2293. (This language survives in Sec. 166(e), 42 U.S.C. Sec. 7476(e).)
 
 
 14
 In that context, it seems plain that the stringency concept would be both workable and completely faithful to a broad vision of the relevant goals and purposes. State increments for a Set II pollutant set at exactly the same percentages of ambient standards as were the House-proposed statutory ones would surely be at least as effective in fulfilling the goals and purposes of the program.
 
 
 15
 Compromise with the Senate, however, altered the context of the phrase. See H.R.Conf.Rep. No. 95-564, 95th Cong., 1st Sess. (1977), U.S.Code Cong. & Admin.News 1977, p. 1077, reprinted in 3 Legislative History at 531 (tersely describing compromise). The Senate bill had merely commanded the EPA to study the Set II pollutants and report back to Congress with proposed increments. S. 252, 95th Cong., 1st Sess. Sec. 6, at 20-21 (May 10, 1977), reprinted in 3 Legislative History at 594-95. In the ensuing compromise, the House gave up the statutory fixing of Set II increments, and accepted a statute assigning to the EPA a discretion somewhat paralleling that which the House bill had extended to the states. The Senate gave up its requirement of an EPA report back to Congress, and instead allowed the EPA itself to promulgate the program.
 
 
 16
 The wrenching of the "at least as effective" formula from its moorings in the House bill created the range of choices that we have reviewed. The practical problems of the "protective" and "optimal" readings arise from the need to compare the "effectiveness" of regulations across pollutants. When we consider both the practical problems and the legislative history, we believe EPA's choice of the percentage stringency test permissible for purposes of subsection (d). Not surprisingly, the nitrogen dioxide increments now under review are almost identical to the increments that would have become law under the House bill.[10]
 
 
 17
 As a reading of Sec. 166 as a whole, however, EPA's approach overlooks both the language of subsection (c) and the vector of forces represented by the Senate bill. The Senate originally wanted more study conducted on the Set II pollutants, with Congress to make the final choice. Subsection (c) appears to manifest much of this intention, merely substituting the EPA for Congress as decisionmaker. Thus, except to the extent that EPA may properly read subsection (d) as limiting subsection (c), a failure to assess a pollutant in terms of the PSD goals breaches the agency's duty to consider all the relevant statutory factors. See Motor Vehicle Manufacturers Ass'n of U.S. v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); Specialty Equipment Market Ass'n v. Ruckelshaus, 720 F.2d 124, 132 (D.C.Cir.1983). The EPA candidly admits it did not make that inquiry.[11] See, e.g., Proposed Rules, 53 Fed.Reg. at 3701/2.
 
 
 18
 Now we must turn to some possible relations between the two subsections, for the moment identifying subsection (d) with EPA's stringency interpretation. First, one might, as EPA evidently did, read the two as providing the agency an absolute safe harbor: if the regulations mirror the Set I restrictions on a percentage basis, the EPA is free to disregard whatever the inquiry under subsection (c) might yield. The difficulty with this reading, seemingly incurable, is that it turns subsection (c) into no more than an EPA option, despite mandatory wording.
 
 
 19
 Second, while subsection (c) commands a broad weighing of factors, subsection (d) might operate as a limited safe harbor (a presumptive baseline)--authorizing regulations that follow the House approach if but only if the Administrator determines (without being arbitrary and capricious) that the criteria under subsection (c) do not call for a more, or a less,[12] stringent standard. EDF appeared at oral argument to endorse this view, and, while we by no means regard the position as any kind of binding concession, we do find it at least superficially conformable to the statutory language.
 
 
 20
 If we relax the assumption that subsection (d) imposes a simple stringency test, further alternatives open up. For example, if EPA should read subsection (d)'s "at least as effective" test in terms of optimality, it could function as a refinement of subsection (c)'s mandate to fulfill the specified "goals and purposes," telling EPA how to balance the competing environmental and economic goals. At one time EPA appears to have contemplated such a melding of the two sections, though recognizing some of its formidable difficulties.[13]
 
 
 21
 While we read the ambiguities and perplexities of the statute as delegating to the agency a broad interpretive authority, as we must under Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984), we cannot affirm the agency's action on the current record. The reading that we have hypothesized of Sec. 166(d) as a contingent safe harbor requires the agency first to adopt that view, then to determine that the inquiry under subsection (c) does not require a more stringent standard. It has done neither. We cannot sustain an action merely on the basis of interpretive theories that the agency might have adopted and findings that (perhaps) it might have made. See SEC v. Chenery Corp., 318 U.S. 80, 92-95, 63 S.Ct. 454, 461-63, 87 L.Ed. 626 (1943); Wisconsin's Environmental Decade, Inc. v. SEC, 882 F.2d 523, 528 (D.C.Cir.1989); cf. Phillips Petroleum Co. v. FERC, 792 F.2d 1165, 1172 (D.C.Cir.1986).
 
 
 22
 III. EPA's Use of the National Ambient Standards
 
 
 23
 EDF attacks not only EPA's conclusory decision to allow Sec. 166(d) to supplant subsection (c), but also its choice of the ambient standards under sections 108 and 109 of the Clean Air Act, 42 U.S.C. Secs. 7408-09, as the sole basis for deriving permissible increments. That choice resulted in EPA's defining increments for only one compound of nitrogen oxides (NO2 ), and defining them only in terms of annual averages. See page 6 above. Here the problem is that the "goals and purposes" of the PSD program, set forth in Sec. 160, are not identical to the criteria on which the ambient standards are based, Secs. 108(a) and 109(b), 42 U.S.C. Secs. 7408(a), 7409(b). See also Sec. 101, 42 U.S.C. Sec. 7401 (overall goals of the Act). Although the statutory guidelines for the ambient standards seem to encompass everything imaginable, e.g., "the public welfare," see Sec. 109(b)(2), Sec. 160 emphasizes special considerations, such as national wilderness areas and their "natural, recreational, scenic, or historic value[s]." Thus a pollutant that has only mild public health effects but severe effects on wilderness areas might demand a lower increment (measured as a percentage of its ambient standards) than one with severe health effects but only mild effects on wilderness areas.[14] Moreover, as EDF points out, the 1977 amendments had directed EPA to issue its Set II PSD limits within two years and to review and revise its Sec. 108 criteria by January 1, 1980. Had EPA kept to the deadlines (which it didn't) and piggybacked the PSD increments on the ambient standards (which it did), the increments would have been at risk of being rendered obsolete almost immediately after promulgation. Nevertheless the ambient standards are the "basic measure of air quality under the [Clean Air Act]," Proposed Rules, 53 Fed.Reg. at 3700/3, and the controlling standards by no means exclude any value that is the subject of focus under the PSD provisions.
 
 
 24
 Our analysis of this challenge differs for the two disputed subsections of Sec. 166. For subsection (d), we have already held that EPA's use of the Set I percentages of ambient standards was permissible. Thus, EDF cannot prevail on the argument that the NO2 increments are not "as effective as" (or "as stringent as") the sulfur dioxide increments just because the NO2 increments do not include short-term increments while the sulfur dioxide increments do. Subsection (c), however, commands the Administrator to inquire into a pollutant's relation to the goals and purposes of the statute, and we find nothing in the language or legislative history suggesting that this duty could be satisfied simply by referencing the ambient standards. EDF may still, therefore, make the argument on remand that under subsection (c) short-term increments or increments for other nitrogen oxide compounds are needed to "protect[ ] air quality values, and fulfill the goals and purposes" of the statute. Obviously EPA's resolution of the issue will depend on the interpretation it selects for harmonizing subsections (c) and (d). See supra pp. 188-190.
 
 IV. Remedy
 
 25
 No party to this litigation asks that the court vacate the EPA's regulations, and to do so would at least temporarily defeat petitioner's purpose, the enhanced protection of the environmental values covered by the PSD provisions. Moreover, there is no way by which the court can determine what effect the EPA's reasoned exercise of its authority may have. Accordingly we remand the case for the EPA to develop an interpretation of Sec. 166 that considers both subsections (c) and (d), and if necessary to take new evidence and modify the regulations. See Ford Motor Co. v. NLRB, 305 U.S. 364, 373, 59 S.Ct. 301, 306, 83 L.Ed. 221 (1939). While EDF asks that the remand include imposition of an immediate deadline of two years, based on the original deadline created by statute in 1977, cf. Sierra Club v. Thomas, 658 F.Supp. at 175, we refrain from any current ruling on this request.
 
 
 26
 So ordered.
 
 
 
 [1]
 The program originated in 1972 with a brief order of the district court for the District of Columbia enjoining the Environmental Protection Agency from approving any state air pollution control plan that would permit the "significant deterioration" of air quality in regions where it was better than the EPA's national ambient standards. Order (D.D.C. May 30, 1972), quoted in Approval and Promulgation of Implementation Plans (Notice of Proposed Rulemaking), 38 Fed.Reg. 18,986/1 (1973); for opinion of court, see Sierra Club v. Ruckelshaus, 344 F.Supp. 253 (D.D.C.1972), aff'd without opinion, 2 Envtl.L.Rep. 20,656 (D.C.Cir.1972), aff'd by an equally divided court sub nom. Fri v. Sierra Club, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973). The decision was loosely grounded in the Clean Air Act's preamble, which states that one of the goals of the Act is "to protect and enhance the quality of the Nation's air resources." Sec. 101(b), 42 U.S.C. Sec. 7401(b) (1982). EPA responded with a new set of regulations. See Prevention of Significant Air Quality Deterioration, 39 Fed.Reg. 42,510 (1974), aff'd, Sierra Club v. EPA, 540 F.2d 1114 (D.C.Cir.1976), vacated and remanded in light of new legislation sub nom. Montana Power Co. v. EPA, 434 U.S. 809, 98 S.Ct. 40, 54 L.Ed.2d 66 (1977)
 
 
 [2]
 For Set I pollutants, a baseline concentration is defined as "the ambient concentration levels which exist at the time of the first application for a [major emitting facility] permit," including concentrations due to projected emissions from facilities on which construction began prior to January 6, 1975. Sec. 169(4), 42 U.S.C. Sec. 7479(4). Under Sec. 165(a), 42 U.S.C. Sec. 7475(a), a permit is required to construct any new major emitting facility, which is defined basically as any large industrial plant, see Sec. 169(1), 42 U.S.C. Sec. 7479(1). Thus, the baseline concentrations for Set I are set shortly after the statute takes effect. See also 40 CFR Sec. 51.166(b)(13)-(15) (defining baseline concentrations more precisely)
 
 
 [3]
 Without any explanation, the EPA abruptly terminated the rulemaking process begun with this notice, see Regulations Deleted From the Previous Agenda, 46 Fed.Reg. 54,036 (1981), and did not resume rulemaking until a court order in Sierra Club v. Thomas, 658 F.Supp. 165 (N.D.Cal.1987), required it to do so
 
 
 [4]
 The baseline concentrations for nitrogen dioxide were defined as (approximately) the concentrations existing on February 8, 1988, the date of publication of the proposed rules. (For a more precise definition, see 40 CFR Sec. 51.166(b)(13)-(15).) The EPA chose this date over the date on which the Sec. 166 rules should have become effective under the statutory time limits (August 7, 1980) because of (among other reasons) the practical difficulties in reconstructing data from the earlier period. Prevention of Significant Deterioration for Nitrogen Oxides ("Final Rules"), 53 Fed.Reg. 40,656, 40,668/3-40,669/2 (1988). EDF objected to this decision below, see Comments by the Environmental Defense Fund, et al., on Proposed Regulations for Prevention of the Significant Deterioration of Air Quality for Nitrogen Oxides at 21-22 ("EDF Comments"), but does not challenge it here
 
 
 [5]
 Regulations of NO2 can also indirectly limit other nitrogen oxide compounds because atmospheric processes convert NO2 into other nitrogen oxide compounds. See EDF Comments at 4
 
 
 [6]
 The lower of the two was the figure that the House version of the Clean Air Act Amendments used in setting its proposed increments. See H.R. 6161, 95th Cong., 1st Sess. Sec. 108(a) at 296-97 (April 6, 1977), reprinted in Senate Committee on Environment and Public Works, 4 A Legislative History of the Clean Air Act Amendments of 1977 2281-82 (1978) ("Legislative History "). Since EPA relies primarily on the House's approach to justify its actions, see n. 8 below, its choice of this figure is reasonable, possibly compelled. See also Final Rules, 53 Fed.Reg. at 40,661/3 (asserting that Congress generally calculated the increments "as a percentage of the lower of the primary or secondary NAAQS")
 
 
 [7]
 Sources: 40 CFR Secs. 50.4-50.7 (1977); 40 CFR Sec. 50.11 (1988); Sec. 163(b), 42 U.S.C. Sec. 7473(b); Final Rules, 53 Fed.Reg. at 40,670-71, codified at 40 CFR Sec. 51.166. In Class I the increments of sulfur dioxide and particulate matter were not set to the same percentage of their ambient standards. The EPA selected the sulfur dioxide increment as the model for NO2 because it found that "nitrogen dioxide more closely resembles sulfur dioxide than particulate matter in its characteristics and sources of emissions." Final Rules, 53 Fed.Reg. at 40,657/3; see also Proposed Rules, 53 Fed.Reg. at 3704/3 (same)
 Ambient Standards :
Particulate Matter:
 Annual ............................... 75 (1977)
 Twenty-four hour .................... 150 (1977)
Sulfur Dioxide:
 Annual ............................... 80 (1977)
 Twenty-four hour .................... 365 (1977)
 Three hour ......................... 1300 (1977)
Nitrogen Dioxide
 Annual .............................. 100 (1988)
 Class I Increment (and percentage of ambient standards):
Particulate Matter:
 Annual ................................ 5 (6.7%)
 Twenty-four hour ..................... 10 (6.7%)
Sulfur Dioxide:
 Annual ................................ 2 (2.5%)
 Twenty-four hour ...................... 5 (1.4%)
 Three hour ........................... 25 (1.9%)
Nitrogen Dioxide
 Annual .............................. 2.5 (2.5%)
 Class II Increment (and percentage of ambient standards):
Particulate Matter:
 Annual ............................... 19 (25%)
 Twenty-four hour ..................... 37 (25%)
Sulfur Dioxide
 Annual ............................... 20 (25%)
 Twenty-four hour ..................... 91 (25%)
 Three hour .......................... 512 (39%)
Nitrogen Dioxide
 Annual ............................... 25 (25%)
 Class III Increment (and percentage of ambient standards):
Particular Matter:
 Annual 37 (50%)
 Twenty-four hour 75 (50%)
Sulfur Dioxide:
 Annual 40 (50%)
 Twenty-four hour 182 (50%)
 Three hour 700 (54%)
Nitrogen Dioxide
 Annual 50 (50%)
 
 
 [8]
 EPA spoke of Congress as having "set[ ] increments (with certain exceptions) as a percentage of the NAAQS level for each pollutant, and using the same averaging time and units of measurement as the NAAQS." Proposed Rules, 53 Fed.Reg. at 3700/3. The qualifier evidently refers to the Set I increments for Class I. They derived from the Senate bill, see H.R.Conf.Rep. No. 95-564, 95 Cong., 1st Sess. (1977), reprinted in 3 Legislative History at 531, which in turn derived from EPA's own existing regulations, compare S.Rep. No. 95-127, 95th Cong., 1st Sess. 30 (1977), reprinted in 3 Legislative History at 1404, U.S.Code Cong. & Admin.News 1977, p. 1077, with the final rules in Prevention of Significant Air Quality Deterioration, 39 Fed.Reg. at 42,515/1; codified at 40 CFR Sec. 52.21(c)(2)(i) (1977), and these in turn had been promulgated with little explanation as to how the actual levels had been set, see Approval and Promulgation of Implementation Plans (Proposed Rules), 39 Fed.Reg. 31,00 0, 31,001/2 (1973) (stating that the "determination of that level of deterioration which constitutes 'significant' deterioration is basically a subjective decision"). See also Implementation Plans (Notice of Proposed Rulemaking), 38 Fed.Reg. at 18,990/2 (increment levels "represent the Administrator's best judgment")
 Even as to the increments derived from the House bill, while it is true that that bill explicitly framed them as percentages of the ambient standards, see H.R. 6161, 95th Cong., 1st Sess. Sec. 108(a) at 296-97 (April 6, 1977), reprinted in 4 Legislative History at 2281-82, Sec. 163 as it finally emerged simply used the resulting absolute numbers.
 
 
 [9]
 It contests one aspect, however, namely the use solely of the specific pollutant's ambient standard(s), rather than ambient standards for the Set I pollutants, where EPA's ambient standard for the pollutant omitted a type of standard that had been employed for Set I, e.g., as here, a short-term limit. See EDF Comments at 19-21. We discuss this challenge infra pp. 189-190
 
 
 [10]
 The only difference is that under the House proposal the annual Class I increment would have been 2 micrograms per cubic meter (2% of the ambient standards), rather than 2.5 micrograms (2.5%)
 
 
 [11]
 Though at one point the EPA claimed to have "considered a variety of factors ... [including] the potential or possible adverse effects of the pollutant," 53 Fed.Reg. at 40,661/1, it did so only within the comparative framework of the "at least as effective" standard. Thus it resorted to its presumptive stringency method based on percentages of the national ambient standards once it found insufficient evidence "as to the relative adverse effects of sulfur dioxide versus nitrogen dioxide." Id. at 40,661/2 (emphasis added). Subsection (c) does not require such a comparison. While there may not be enough evidence to compare nitrogen dioxide with sulfur dioxide, EPA could find that the evidence for nitrogen dioxide alone, judged directly by the criteria of subsection (c), warrants different increments
 
 
 [12]
 A separate question is whether and how subsection (d) operates as a floor--requiring the regulations to be "at least as stringent as" the House proposal. Subsection (c) could still be either discretionary (under a pure safe harbor reading) or conditionally mandatory (under a limited safe harbor), but the Administrator would be able to deviate in only one direction (greater stringency). While treating it as indeed a floor fits the literal language of the two subsections, both acting as independent constraints, it is puzzling in that it seems to sacrifice desirable economic growth even when a less stringent standard would amply and clearly satisfy the environmental goals of subsection (c)
 
 
 [13]
 See Declaration of Gerald A. Emison [EPA's Director of the Office of Air Quality Planning and Standards during the Sierra Club v. Thomas litigation] p 9, at 5, p 41, at 20-21, Sierra Club v. Thomas, 658 F.Supp. 165 (N.D.Cal.1987) (No. C 86-0971)
 
 
 [14]
 The EPA recognized this problem to some extent. See Proposed Rules at 3701/2